GILBERTSON, Chief Justice:
(concurring in the result). .
[¶52.] Although I agree the circuit court’s denial of Jones’s motion to suppress should be affirmed, I dissent from the Court’s analysis. Today, the Court holds that the U.S. Constitution requires law enforcement to obtain a search warrant before conducting “long-term surveillance” (in this case, two-month video surveillance) of the front of a residence from a public vantage point. Yet, the United States Supreme Court “has to date not deviated from the understanding that mere visual observation does not constitute a search.” United States v. Jones, 565 U.S. 400, 412, 132 S.Ct. 945, 953, 181 L.Ed. 2d 911 (2012). Accordingly, courts throughout this nation have overwhelmingly—if not unanimously—acknowledged the same. This Court has failed to identify even a single opinion holding that an officer needs a warrant to record with a camera that which can be viewed by the naked eye without a warrant. This decision stands alone in its holding despite the fact that this is hardly a case of first impression. In light of the United States Supreme Court’s explicit statement in Jones, as well as an overwhelming body of persuasive authorities, I would' affirm the circuit court’s denial of Jones’s motion to suppress evidence on the merits without resorting to the good-faith exception.
[¶53.] The State may not unreasonably search or seize an individual. U.S. Const, amend. IV; S.D. Const, art. VI, § 11. Under the Fourth Amendment, “the ‘police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure!)]” Terry v. Ohio, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed. 2d 889 (1968). Unless an exception applies, ■ observation is a *116 search in the constitutional sense when accomplished by government trespass into an area protected by the Fourth Amendment. Jones, 565 U.S. at 406, 132 S.Ct. at 950 (“[F]or most of our history the Fourth Amendment was understood to embody a particular concern for government trespass upon the areas (‘persons, houses, papers, and effects’) it enumerates.”). Even when a trespass does not occur, “a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable.” Kyllo v. United States, 533 U.S. 27, 33, 121 S.Ct. 2038, 2042, 150 L.Ed. 2d 94 (2001).
[¶54.] This case does not involve a physical trespass into a protected area; therefore, we must determine whether Jones exhibited a subjective expectation of privacy that is objectively reasonable. Under the first prong, Jones has not established that he subjectively believed his activities in front of his home—in particular, dumping his trash—were concealed from public view. As the State points out, “[Jones’s] trailer was not obstructed by any fence, gate, or anything else that blocked its view from the public street or pole camera.” See United States v. Bucci, 582 F.3d 108, 116-17 (1st Cir. 2009) (“There are no fences, gates or shrubbery located in front of Buc-ci’s residence that obstruct the view of the driveway or the garage from the street. Both are plainly visible.”). Jones’s briefs to this Court do not even claim—let alone prove—that Jones subjectively believed his activities in front of his home were concealed from public observation. Likewise, although the Court’s opinion includes a section labeled “Subjective Expectation of Privacy,” supra ¶¶ 27-31, that section is devoted entirely to discussing whether it was possible for Jones to have a subjective expectation of privacy—not whether he actually had one. After concluding Jones could have had one, the Court simply assumes that he did.[3]
[¶55.] Even if we assume that Jones subjectively believed his activities in front of his home were concealed from public observation, such a belief would not be objectively reasonable. The United States Supreme Court has long held that “the mere fact that an individual has taken measures to restrict some views of his activities [does not] preclude an officer’s observations from a public vantage point where he has a right to be and which renders the activities clearly visible.” California v. Ciraolo, 476 U.S. 207, 213, 106 S.Ct. 1809, 1812, 90 L.Ed. 2d 210 (1986). “What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.” Katz v. United States, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed. 2d 576 (1967). Thus, “visual observation [of the portion of a house that is in plain public view] is no ‘search’ at all[.]” Kyllo, 533 U.S. at 32, 121 S.Ct. at 2042. The Supreme Court “has to date not deviated from the understanding that mere visual observation does not constitute a search.” Jones, 565 U.S. at 412, 132 S.Ct. at 953 (emphasis added) (citing Kyllo, 533 U.S. at 31-32, 121 S.Ct. at 2041-42).
[¶56.] Despite the Jones majority’s unambiguous affirmation that mere visual observation does not constitute a search, this Court now claims “there is no controlling *117 law” that “concerns long-term, remote surveillance!.]” Supra ¶ 40. Based on this claim, the Court adopts a new Fourth Amendment theory advanced by Justice Alito in his four-vote, concurring opinion in Jones.[4], According to the Court, surveillance may become a search within the meaning of the Fourth Amendment based on the quality and quantity of information obtained. See supra ¶¶ 34-85. Thus, because the Court finds that visually observing the front of Jones’s residence for eight weeks produced a “wealth” of personal information, supra ¶ 36, the Court concludes the use of a pole camera in this ease was a search.
[¶57.] The Court’s claim that the constitutionality of long-term surveillance is an open question, supra ¶ 34, is incorrect. The Court supports this claim by citing but not quoting Jones, 565 U.S. at 412, 132 S.Ct. at 954. Yet, this portion of the Jones opinion does not even mention the duration of surveillance let alone indicate that such is a factor in determining whether a search has occurred. Even if it did, the Supreme Court has indicated that even year-long visual observation of a residence is not a search under the Fourth Amendment. See Kyllo, 533 U.S. at 35 n.2, 121 S.Ct. at 2043 n.2. If a period of one year is not “too long,” then neither is the eight-week period at issue in this case.
[¶58.] More importantly, the notion that observation through electronic, sense-enhancing means may be a search under the Fourth Amendment is hardly a new concept; the Supreme Court said the same in Kyllo, 533 U.S. at 34, 121 S.Ct. at 2043. In that case, the Supreme Court considered “whether the use of a thermal-imaging device aimed at a private home from a public street to detect relative amounts of heat within the home constitutes a ‘search’ within the meaning of the Fourth Amendment.” Id. at 29, 121 S.Ct. at 2040-41. In concluding that such surveillance does constitute a search, the Supreme Court distinguished mere visual observation from law enforcement’s use of “sense-enhancing technology[.]” Id. at 34, 121 S.Ct. at 2043. The Supreme Court held: “Where, as here, the Government uses a device that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a ‘search’ and is presumptively unreasonable without a warrant.” Id. at 40, 121 S.Ct. at 2046. Thus, the Jones majority’s electronic-means statement does not suggest an “open question”; it simply refers to existing precedent.[5]
[¶59.] Even if the Jones majority’s reference to Kyllo’s electronic-means analysis could be read as indicating the constitutionality of long-term surveillance is an open question, this Court should not follow Justice Alito’s concurring opinion.[6]. Not *118 only did a majority- of the Supreme Court decline to adopt the quality-and-quantity-of-infomation approach in Jones, the Supreme Court has previously said that “[t]he Fourth Amendment’s protection of the home has never, been tied to measurement of- the quality or quantity of information obtained.” Kyllo, 533 U.S. at 37, 121 S.Ct. at 2045 (emphasis added). Rather, the question whether police conduct constitutes a search depends on the method of surveillance, not the product of surveillance. Id. at 37-40, 121 S.Ct. at 2045-46.[7] The Jones majority’s electronic-means statement only confirms this view,- If the quality and quantity of information’' obtained dictates whether surveillance is a search, then the method of obtaining that information should not matter; yet, this conclusion is clearly contrary to Jones. See Jones, 565 U.S. at 412, 132 S.Ct. at 953-54 (observing that one method of surveillance may be constitutional even though obtaining the same■ information via another method is unconstitutional).
[¶60.] So contrary to the Court’s claim that there is no controlling authority, supra ¶ 40, this case is squarely controlled by, e.g., Kyllo and Katz. And under these binding opinions, the question that should be addressed in this case is whether the device used by the State is “in general public use” and whether, the State used that device “to explore details of the home that would previously have been, unknowable ■without physical intrusion[.]” Kyllo, 533 U.S. at 40, 121 S.Ct. at 2046, Contrary to the Court’s suggestion that this case implicates the “advance of technology[,]” supra ¶ 23 (quoting Kyllo, 533 U.S. at 33-34, 121 S.Ct. at 2043), video cameras have beeii in general public use for years, if not decades. The camera at issue here was not equipped with night vision, let alone structure-penetrating detection like the thermal-imaging device at issue in Kyllo, 533 U.S. at 29, 121 S.Ct. at 2041. Rather, the camera observed only that which is also observable by the naked eye. In short, law enforcement did not utilize sense-enhancing technology; they simply employed a device that is in general public use.[8]
[¶61.] Moreover, the State did not use the video camera “to explore details of the home that would previously have béen unknowable without physical intrusionQ” Id. at 40, 121 S.Ct. at 2046. The circuit court found that “the pole camera could not see *119 inside of [Jones’s] residence or in the backyard[.]” (Emphasis added.). And as noted above, there were no-obstructions preventing public observation of Jones’s residence. This point alone has been sufficient for essentially every other court in the nation that has addressed this issue to conclude that surveillance accomplished by placing a video camera in a public place is not a search under the Fourth Amendment. See United States v. Houston, 813 F.3d 282, 287-88 (6th Cir. 2016) (upholding 10-week surveillance), cert. denied, — U.S. -, 137 S.Ct. 567, 196 L.Ed. 2d 448 (2016); Bucci, 582 F.3d at 116-17 (upholding eight-month surveillance); United States v. Gonzalez, 328 F.3d 543, 548 (9th Cir. 2003); United States v. Jackson, 213 F.3d 1269, 1280-81 (10th Cir. 2000), vacated on other grounds, 531 U.S. 1033, 121 S.Ct. 621, 148 L.Ed. 2d 531 (2000); United States v. Pratt, No. 16-cr-20677-06, 2017 WL 2403570, at *5 (E.D. Mich. June 2, 2017) (upholding 14-month surveillance); United States v. Bailey, No. 15-CR-6082G, 2016 WL 6995067, at *33 (W.D.N.Y. Nov. 29, 2016); United States v. Campuzano-Chavez, No. CR-15-00154-HE, 2016 WL 879326, at *4 (W.D. Okla. Mar. 7, 2016); United States v. Gilliam, Nos. 02:12-cr-93, 02:13-cr-235, 2015 WL 5178197, at *9 (W.D. Pa. Sept. 4, 2015); United States v. Garcia-Gonzalez, No. 14-10296-LTS, 2015 WL 5145537, at *9 (D. Mass. Sept. 1, 2015) (upholding six-month surveillance); United States v. Root, No. 2:14-CR-0001-TOR-2, 2014 WL 4715874, at *6 (E.D. Wash. Sept. 22, 2014) (“Defendant does not have a legitimate expectation of privacy in activities which occurred in that public alleyway, readily observable by any passerby.”); United States v. Moore, No. 14-20206-CR, 2014, WL 4639419, at *2-3 (S.D. Fla. Sept. 16, 2014) (upholding eight-month surveillance); United States v. Wymer, 40 F.Supp.3d 933, 939-40 (N.D. Ohio 2014) (upholding four-month surveillance); Martinez-Turcio v. United States, Cr. No. 6:10-cr-00054-GRA-1, C/A No. 6:13-cv-01139-GRA, 2013 WL 12106924, at *9-10 (D.S.C. Oct. 18, 2013); United States v. Baltes, No. 8:11-cr-282 (MAD), 2013 WL 11319002, at *7 (N.D.N.Y. Apr. 22, 2013); United States v. Nowka, No. 5:11-CR-474-VEH-HGD, 2012 WL 6610879, at *5 (N.D. Ala. Dec. 17, 2012) (upholding eight-month surveillance because “what could be seen on the surveillance recording was in no way different (other than angle of view) from that which any person could see from the public street”); United States v. Brooks, 911 F.Supp.2d 836, 843 (D. Ariz. 2012) (upholding five-month-long, surveillance because it “was ‘a prudent and efficient use of modern technology’ to enhance their sense of: sight and allowed for law enforcement to see ‘what may be seen’ from a public vantage point where they had a right to be”); United States v. Aguilera, No. 06-CR-336, 2008 WL 375210, at *2 (E.D. Wis. Feb. 11, 2008) (“[The] substitution of a camera for in-person surveillance does not offend the Fourth Amendment ....”); United States v. Clarke, No. CRIM.3:04 CR SRU, 2005 WL 2645003, at *2 (D. Conn. July 19, 2005) (upholding eight-month surveillance); United States v. West, 312 F.Supp.2d 605, 616 (D. Del. 2004); Rodriguez v. United States, 878 F.Supp. 20, 24 (S.D.N.Y. 1995); State v. Duvernay, No. 1-16-62, 2017 WL 2537559, at *3-6 (Ohio Ct. App. June 12, 2017) (upholding nine-day surveillance).[9] And now, because of the Court’s decision today, this *120 overwhelming body of authority may be followed by a solitary dissenting opinion: But see State v. Jones, 2017 S.D. 59, 903 N.W.2d 101.
[¶62.] I agree that the thought of a surveillance camera on every utility pole may be concerning to many. But contrary to the Court’s view, stretching the Fourth Amendment in contravention of controlling precedent is not the answer. If the Court’s fear of an “Orwellian ... surveillance society,” supra ¶ 37, actually becomes reality, the people of South Dakota—through their elected representatives in the Legislature—are more than capable of regulating law enforcement’s use of long-term surveillance.[10] As Justice Alito noted in the writing the Court seeks to adopt today, the best solution to such concerns is legislative—not judicial. Jones, 565 U.S. at 429-30, 132 S.Ct. at 963-64 (Alito, J., concurring in the judgment). The legislative solution allows for public input and permits the people’s elected representatives in the Legislature—rather than three members of this Court—to “gauge changing public-attitudes, to draw detailed lines, and to balance privacy and public safety in a comprehensive way.” Id. at 429-30, 132 S.Ct. at 964. It would further allow for changing statutes "to meet with changing times. If this Court undervalues the public’s concern for privacy as compared to its concern for public safety, the Legislature can always compensate. However, because the Court decides this case as an issue of constitutional law, the Legislature will be powerless to properly balance the competing public interests if this Court overvalues the perceived public interest in privacy.[11] The citizens of South Dakota would be locked out of the process unless 35 states were to amend the United States Constitution.
[¶63.] Existing, controlling precedent is clear: mere visual observation does not *121 constitute a search. Id. at 412, 132 S.Ct. at 958 (majority opinion). Law enforcement did not use sense-enhancing technology; they observed only that which was observable by the naked eye. Therefore, even if Jones had argued and proved he had a subjective expectation of privacy, such expectation would not have been objectively reasonable. Because the United States Supreme Court has explicitly and implicitly ■rejected the quality-and-quantity-of-information approach, this Court must as well. If the controlling law is to change, such change should come either from the United States Supreme Court or the South Dakota Legislature. I would affirm the circuit court’s decision on the merits. I wou^ n°t reach the goodrfaith issue,
[¶64.]
ZINTER, Justice, joins Chief Justice’s writing,

. According to the Court, Jones "claims that he had a subjective expectation of privacy in the whole of his movements. In particular, he asserted that he expected to be free from 24/7 targeted, long-term observation[.]” Supra ¶ 28. But this claim is unsupported. Jones’s argument to this Court consists almost entirely of analogizing this case to State v. Zahn, 2012 S.D. 19, 812 N.W.2d 490. Nowhere does Jones claim to have had a subjective expectation of privacy.

. The Court suggests Justice Alito’s view is controlling because according to the Court, Justice Sotomayor "endorsed” Justice Alito’s writing. Supra ¶¶ 19, 25. Yet, Justice Sotoma-yor did not join Justice Alito’s writing. In fact, she explicitly joined the majority opinion, which declined to reach the issues raised by Justice Alito. Jones, 565 U.S. at 418, 132 S.Ct. at 957 (Sotomayor, J., concurring).

. The Court dismisses Kyllo, which was decided in 2001, as a case decided "years ago.” Supra ¶ 22. United States Supreme Court opinions do not have expiration dates. Moreover, in the very next paragraph, the Court relies on Kytlo for the Court’s central proposition—that the advance of technology affects the public's expectation of privacy. See supra ¶ 23.

.The Court cites State v. Zahn, 2012 S.D. 19, 812 N.W.2d 490, as if this Court had already adopted the quality-and-quantity-of-information theory. See supra ¶ 37. Although we discussed Justice Alito’s concurring opinion from Jones in Zahn, we did so only after applying the Jones majority’s physical-trespass analysis to conclude a search had oc *118 curred. Zahn, 2012 S.D, 19, ¶ 19, 812 N.W.2d at 496. Two of the five justices on this Court disagreed with issuing that .dictum. The remaining three justices found it ‘‘appropriate” only because "both parties focused on the application of the Katz ‘reasonable expectation of privacy’ test” and because ‘‘[a]t the time [the] case was argued, the United States Supreme, Court had not yet decided Jones.” Zahn, 2012 S.D. 19, ¶ 20 n.3, 812 N.W.2d at 496 n.3. Thus, Zahn’s dictum is specifically confined to that case.

. If the need for a warrant depends on the product of surveillance, law enforcement will not know whether a warrant is required until after the surveillan’ce has been conducted. In practice, then, law enforcement should seek a ' warrant for any surveillance from a public vantage point lest this Court subsequently consider the surveillance too successful,

. The Court claims "the pole camera is not a mere video camera” because of how it was used: "The pole camera captured Jones’s activities outside his home twenty-four hours a day, sent the recording to a distant location, and allowed the officer to view it at any time and to replay moments in time,” Supra ¶ 36. Yet as noted above, the camera at issue was not equipped with night vision—its capabilities were subject to the same limitations as the human eye—so the effective observation ‘ time Was not 24 hours per day. Moreover, contrary to the Court’s dated view of technology, streaming video is in widespread use in a variety of applications. From Netflix to smart homes and wireless nanny cams, watching live or recorded images on demand (including the ability to "replay moments in time[,]’’ supra ¶ 36) from a distant location is commonplace,

. The Court dismisses the cases in this list that were decided prior to United States v. Jones. See supra ¶¶ 16-17. The Court premises its dismissal of the pre-Jones cases on the erroneous conclusion that Jones changed existing precedent. But as noted above, Justice Alito’s writing received only four votes—not five. Supra ¶ 56 n.4. Simply put, Jones did not change, the conclusion that a person does not have a reasonable expectation of privacy in *120 his public movements. 1 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.7(g) (5th ed.), Westlaw (database updated Oct. 2016) (citing United States v. Knotts, 460 U.S. 276, 281, 103 S.Ct. 1081, 1085, 75 L.Ed. 2d 55 (1983)).
The Court dismisses even the cases that were decided after Jones because they do not address "the aggregate nature of the surveillance[.]” Supra ¶ 20. Yet, the Court of Appeals for the Sixth Circuit explicitly "rejected the claim that the length of the period of monitoring [can make] surveillance constitutionally unreasonable!.]” United States v. Powell, 847 F.3d 760, 773 (6th Cir. 2017). Moreover, the Court's argument begs the question whether the aggregate nature of public surveillance is relevant under current Fourth Amendment jurisprudence. These cases do not address aggregation because as noted in this footnote, the Jones majority did not hold that aggregation is relevant. Given the Court’s inability to identify even a single opinion that holds as it does, the problem lies in the Court's assumption that aggregation is relevant rather than in the analysis of the numerous authorities cited above.

. For example, the Legislature could restrict the duration of warrantless surveillance to two weeks (or some other arbitrary length.of time).

. The Court insists that it does not "prevent the Legislature from regulating long-term surveillance, including surveillance for longer than two months.” Supra ¶ 41. But this con-clusory claim is unsupported. The Court’s opinion repeatedly states the issue as deciding whether "long-term surveillance” is a search within the meaning of the U.S. Constitution. See supra ¶¶ 28-29, 33-36, 40. It is an elementary principle of constitutional law that the South Dakota Legislature has no power, to unilaterally alter the meaning of the U.S. Constitution. According to the Court, the U.S. Constitution proscribes a two-month surveillance of the front of a residence from a public vantage point. Because the U.S. Constitution provides a floor of protection, the Legislature could not possibly authorize warrantless surveillance of two months’ duration or longer— not even if every person in South Dakota thought such surveillance was reasonable.